**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | |
|---|---|
| JANELLE LUSTIG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 4:24-cv-00053-TWP-KMB |
| | ) |
| SWITZERLAND COUNTY, INDIANA in their | ) |
| official capacity, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Switzerland County, Indiana (the "County") (Filing No. 58). Plaintiff Janelle Lustig ("Lustig") is a career paramedic with post-traumatic stress disorder. After her termination from the County, Lustig filed this action asserting claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"); Family and Medical Leave Act, 29 U.S.C. § 2601, ("FMLA"); Fair Labor Standards Act, 29 U.S.C. § 201 ("FLSA"); and Fourteenth Amendment of the United States Constitution. Lustig has since abandoned her FLSA claims (Filing No. 57), and the County now moves for summary judgment on Lustig's remaining ADA, FMLA, and Fourteenth Amendment claims. For the reasons discussed below, the County's Motion for Summary Judgment is **granted in part** and **denied in part**.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Lustig as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.    **Lustig's PTSD and 2021 FMLA Leave**[1]

Lustig has worked in emergency services for over thirty years, and before the events at issue, she was diagnosed with post-traumatic stress disorder ("PTSD") (Filing No. 59-4 at 25:10–22, 118:1–5). In 2018, Lustig was hired as a paramedic for the County's Emergency Medical Services ("EMS") Department. *Id.* at 26:4–28:18, 32:3–25. The County knew about Lustig's PTSD when she was hired. Lustig's supervisor was Nadine Swift ("Swift") (Filing No. 59-1 ¶ 2).

As a paramedic, Lustig sometimes worked 24-hour shifts which required her to spend the night at the station. Because of her PTSD, Lustig had trouble sleeping in the sleeping quarters. She felt more "at rest" while sleeping in the ambulance bay. Swift allowed her to sleep in the ambulance bay, albeit "with a lot of attitude." (Filing No. 59-4 at 120:24–122:2, 61:13–62:3). Lustig's PTSD escalated while working for the County, but according to Lustig, she did not need any job modifications for her PTSD other than sleeping in the ambulance bay. *Id.* at 108:3–5, 122:12–14.

Sometime in 2021, Lustig injured her back and needed surgery. *Id.* at 48:8–50:24. After the accident and surgery, she took time off under the FMLA. Although Swift mistakenly marked Lustig's time off only as sick leave, and not as FMLA-qualifying time, Lustig had no issues taking that time off, and she was not required to work while on leave. *Id.* at 47:15–48:1. She returned to work in 2022. *Id.* at 52:21–25.

B.    **Lustig's Requests for Critical Incident Stress Debriefing**

Lustig eventually became concerned that Swift was overworking herself and not seeking needed help. These concerns either began, or came to a head, during a May 2021 EMS run involving a baby who tragically, was born in a toilet. Lustig thought Swift "froze on the call and left the baby to die." *Id.* at 9:12–13, 55:25–57:16, 81:4–82:13. Swift's perceived recklessness and

---

[1] Although it is unclear whether Lustig took FMLA leave for her back injury in 2021 or early 2022, the Court refers to this leave as Lustig's "2021 FMLA leave" to distinguish it from the FMLA leave Lustig took in October 2022.

the lack of "checks and balances" in the EMS Department "took a toll on [Lustig] emotionally [and] psychologically." *Id.* at 82:3–22.

After this run, Lustig made multiple requests to Swift for a Critical Incident Stress Debriefing ("Stress Debriefing"), *Id.* at 55:12–17, 82:12–13. As described by Lustig, a Stress Debriefing involves "[a] group of trained professionals that have an expertise in first responder's trauma" listening without judgment and/or "walk[ing] you through the call. . . . It's a safe space to be able to just process that trauma." *Id.* at 56:15–23. A Stress Debriefing can be one session or many sessions, and it can be held in a one-on-one or group setting. *Id.* at 56:25–57:3. Lustig wanted a Stress Debriefing for "[a]nybody that was involved in the [May 2021] call," including her, Swift, the other paramedic on scene, and the firefighters and first responders who assisted. *Id.* at 57:4–58:3. Lustig was hoping that after a Stress Debriefing, she would have fewer nightmares and "some sort of inner peace about what happened." *Id.* at 120:24–130:3. Lustig did not seek other counseling after the May 2021 run, but her doctors increased her prescription for prazosin, which Lustig took to block nightmares. *Id.* at 130:4–14.

In September 2022, Lustig responded to another EMS call involving a child who was run over by a bus driver. When the call came in, Lustig was at home and not scheduled to work. *Id.* at 15:15–19:3. Lustig was not required by the County to respond, but she responded anyway because she was nearby and because she felt professionally and ethically obligated to respond. *Id.* 15:14–18, 16:21–22, 17:8–11. After this September 2022 EMS run, Lustig again requested a Stress Debriefing. *Id.* at 128:12–13.

Around this same time, employee Glen Scott ("Scott") made a derogatory comment about Lustig's mental health. Lustig and Swift were discussing a father and daughter who had been brought to the EMS Department when Lustig became emotional and was crying. *Id*. at 141: 5-15.

3

Scott then said to Lustig, "why don't we make you a sign that says you're not f[*]cking available," and Swift laughed. *Id.* at 154:7–155:8. Lustig interpreted Scott's comment as a joke about how emotional Lustig had been. *Id.* at 155:12–15.

After the May 2021 EMS run, Lustig "started to become detached," "disassociate[d]," and felt "unheard." *Id.* at 59:11–60:8. However, between the May 2021 EMS run and her later FMLA leave in October 2022, Lustig was able to perform all her job duties, other than finishing paperwork on time, without any job modifications or accommodations. *Id.* at 62:19–63:4, 65:12–18, 137:4–10. But Lustig does not attribute her inability to complete paperwork to the lack of Stress Debriefing. Instead, she attributes this inability to a lack of time and proper equipment. Lustig testified that "[l]iterally just about everybody" in her department had trouble keeping up with their paperwork. *Id.* at 66:15–67:3, 73:17–25, 78:10–14.

## C.    <u>Meetings With Lustig, 2022 FMLA Leave, and Resignation of Full-Time Position</u>

In September 2022, Swift spoke with County Administrator Susie Swank ("Swank") about Lustig's "disruptive behavior" toward Swift and other EMS staff (Filing No. 59-3 ¶ 7). On October 7, 2022, Swank, Swift, and Lustig met to discuss Lustig's lack of job satisfaction and behavior. *Id.* ¶ 11. During this meeting, Lustig expressed a variety of concerns, including Swift's failure to provide a Stress Debriefing, Swift's unwellness "wreaking havoc on the department," and Scott's derogatory comment about Lustig's mental health. *Id.*; (Filing No. 59-4 at 110:24–111:3).

Lustig also expressed her disagreement with Commissioner Jerry Monjar's ("Commissioner Monjar") investigation into Swift's job performance. Several months earlier, in February 2022, Commissioner Monjar had asked paramedic Eric Tuemler ("Tuemler") to collect employee statements about Swift's performance. *Id.* at 111:6–112:8; (Filing No. 65-5). Tuemler never delivered the statements to Commissioner Monjar and instead put the statements in Lustig's work mailbox. Lustig knew that the statements were in her mailbox and left them there for several

months. *Id.* at 110:2–17. Following the October 7, 2022 meeting, Commissioner Monjar learned that the statements were in Lustig's mailbox (Filing No. 59-7). He asked Lustig for the statements, "[b]ut he was being, super, super nasty," so she refused (Filing No. 59-4 at 113:10–17).

On October 17, 2022, Lustig told Swank that she needed a mental health break from work and asked how much paid leave time she had. Lustig also repeated her request for a Stress Debriefing for the EMS Department (Filing No. 59-3 ¶¶ 15, 19). Lustig then obtained FMLA paperwork, which her doctor completed. *Id.* ¶ 17; (Filing No. 59-4 at 88:19–90 & pp. 148–58).

On October 27, 2022, Commissioner Monjar sent Lustig a letter directing her to deliver the employee statements to him within two business days or face potential disciplinary action (Filing No. 59-7). Also on October 27, 2022, Lustig told Swank that she planned to start taking FMLA leave the next day (Filing No. 59-3 ¶ 24). Lustig took FMLA leave from October 28, 2022, to January 20, 2023 and she was not required to work while on leave (Filing No. 59-4 at 141:1–4, pp. 148–58; Filing No. 59-6 at 3).

On November 1, 2022, Lustig's husband retrieved the statements from her mailbox and delivered them to Swank, who then gave them to Commissioner Monjar (Filing No. 59-4 at 114:2–4; Filing No. 59-3 ¶ 26; Filing No. 65-6 at 1). On December 9, 2022, while still on FMLA leave, Lustig received "her first disciplinary action which was a final written warning for not providing the statements to the Commissioner." (Filing No. 66 at 17). However, Lustig cites no evidence supporting the claim that she received this written warning. S.D. Ind. L.R. 56-1(e), (h).

Before returning from FMLA leave, Lustig emailed Swift that she was resigning her full-time position but wanted to continue serving as a part-time/back-up paramedic (Filing No. 59-1 at 5–6). As a part-time paramedic, she would not work a regular shift and would only work when a

shift needed coverage (Filing No. 59-4 at 24:2–10, 31:7–16). The County does not identify any other differences between full-time and part-time paramedic positions.

When Lustig returned from FMLA leave in 2023, Swift told her that she could not serve as a back-up paramedic until she had completed her unfinished paperwork for prior EMS runs. *Id.* at 73:17–74:11. Swift allowed other paramedics to do runs despite unfinished paperwork. *Id.* at 74:1–7, 97:16–28:20. On March 9, 2023, Swift allowed Lustig to work a shift doing EMS runs, even though Lustig still had not finished all her paperwork. *Id.* at 97:8–12, 100:15–16.

**D.** **Lustig's Call with Tony Rose and Termination**

On March 12, 2023, Lustig was at home with her minor foster child when she called a volunteer paramedic, Tony Rose ("Rose"), about a birthday party for Rose's son (Filing No. 59-4 at 11:14–12, 148:23–149:17). While on the phone, Rose responded to an EMS call. Lustig then had to quickly put down her phone to attend to her child, and Rose put down his phone to begin assessing the patient. Neither Lustig nor Rose disconnected the call. *Id.* at 148:17–21; (Filing No. 59-5 at 17:7–9, 18:5–9). When Lustig picked the phone back up, she heard Rose say something about the patient's lung sounds (Filing No. 59-4 at 149:19–20).

The next day, three EMS employees emailed Swift to report their belief that Lustig had recorded the call between her and Rose while Rose was with the patient (Filing No. 59-1 ¶ 19, pp. 7–11). These reports concerned Swift because an open phone line or recording could have constituted a HIPAA violation.[2] *Id.* ¶ 20. Swift contacted the County's medical director, Dr. James Coots ("Dr. Coots"), and Dr. Coots requested that James Corbin ("Corbin") conduct an internal investigation into the potential HIPAA violation. *Id.* ¶¶ 21–22. Lustig was suspended from work

---

[2] Lustig contends that these statements are inadmissible hearsay (Filing No. 66 at 4–5, 8). However, these statements are not being offered to prove the truth of the matter asserted. Whether Lustig recorded the call with Rose and whether Lustig violated HIPAA are immaterial for purposes of summary judgment.

effective March 17, 2023 (Filing No. 65-8). Swift communicated the suspension to Lustig, but Dr. Coots made the decision to suspend Lustig and Rose (Filing No. 59-1 ¶ 21; Filing No. 65-7).

Corbin interviewed Rose and Lustig as part of his investigation (Filing No. 59-2 at pp. 3–5). Corbin concluded that Lustig had not been honest about the recording of the call, that all Switzerland County Emergency Response employees (except Rose) described Lustig's behavior as toxic and disruptive, and that it was likely that Lustig would retaliate against the employees who complained about her behavior if she returned to duty.[3] *Id.* at p. 5. Based on his investigation, Corbin recommended that the County: terminate Lustig; have Dr. Coots pull his authorization for Lustig to work under his direction; or contact the U.S. Department of Health and Human Services to investigate a potential HIPAA violation. *Id.* After considering Corbin's report, the Commissioners unanimously voted to terminate Lustig's employment. *Id.* ¶¶ 7–8. Lustig received a termination letter in May 2023 (Filing No. 65-1 ¶ 30; Filing No. 59-2 at 6). The Commissioners also terminated Rose's volunteer status (Filing No. 59-5 at 30:25–31:8; Filing No. 59-2 ¶ 7 & p. 6).

## II.    LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and

---

[3] Lustig disputes the truth of Corbin's conclusions (Filing No. 66 at 5), but these conclusions are not offered for the truth of the matter asserted. They are offered merely to show what Corbin reported to the Commissioners.

draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation modified). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation modified). "Neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citation modified); *Bright v. CCA*, No. 10-cv-01690, 2013 WL 6047505, at *3 (S.D. Ind. Nov. 14, 2013) ("Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." (citation modified)).

### III.   DISCUSSION

Lustig's Amended Complaint asserts several claims against the County, Count I: ADA-Disability Discrimination; Count II: ADA-Failure to Accommodate; Count III: ADA-Retaliation; Count IV: Fair Labor Standards Act-Retaliation; Count V: Violations of the Fair Labor Standards Act; Count VI: FMLA Retaliation; Count VII: FMLA Interference: Count VIII: 14th Amendment

Procedural Due Process; Count IX: 14th Amendment Due Process; Count X: 14th Amendment Substantial Due Process. (Filing No. 22 at 12-16). As noted earlier, Lustig abandoned her Fair Labor Standard Act claims. The Court discusses the remaining types of claims in turn.

**A.    ADA Claims**

Lustig alleges that the County failed to accommodate her disability by denying her requests for a Stress Debriefing, and that her suspension and termination was discriminatory and retaliatory. The Court will address Lustig's failure to accommodate claim before discussing her discrimination and retaliation claims together.

**1.    Failure to Accommodate**

Lustig alleges that the County failed to accommodate her disability by denying her repeated requests for a Stress Debriefing (Filing No. 22 ¶¶ 71, 76–77, 86–89). To succeed on a failure-to-accommodate claim, a plaintiff must establish: (1) she is a qualified individual with a disability; (2) the defendant was aware of the disability; and (3) the defendant failed to reasonably accommodate that disability. *Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014). The County argues that Lustig was able to perform her job without an accommodation, so the County had no duty to provide one (Filing No. 69 at 3). The County alternatively argues that even if Lustig could not perform her job duties, there is no evidence that a Stress Debriefing would have effectively accommodated her disability. The Court agrees with the County on both grounds.

**a.    Whether Lustig Needed an Accommodation**

The ADA's anti-discrimination provision applies to any "qualified individual," which means "an individual who, *with or without* reasonable accommodation," can perform their essential job functions. 42 U.S.C. § 12111(8) (emphasis added). The ADA's accommodation provision, by contrast, applies only to an "*otherwise* qualified individual." *Id.* § 12112(5)(B) (emphasis added). The Seventh Circuit has interpreted this distinction to mean that "an employer's

accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job." *Brumfield v. City of Chicago*, 735 F.3d 619, 631–32 (7th Cir. 2013). This is "not because such an accommodation might be unreasonable, but because the employee is fully qualified for the job without accommodation and therefore is not entitled to an accommodation in the first place." *Id.*

During her deposition, Lustig was asked several times about her ability to perform her job duties without accommodations (other than permission to sleep in the ambulance bay). Each time, Lustig clearly answered that she was able to perform her job duties, other than paperwork:

> Q.     So within that time frame of May 14th of 2021 and 20 October 19th of 2022 did you continue going on runs as a paramedic?
>
> A.     Yes.
>
> Q.     And during that time frame were there any of your job duties that you could not do as a paramedic?
>
> A.     No.
>
> Q.     For all the calls that you went out on were you able to complete all the tasks that needed to be completed?
>
> A.     Other than paperwork.
>
> * * *
>
> Q.     During that time period [May 14, 2021, through October 15, 2022] were you put on that regular three day rotation?
>
> A.     Yes. . . . .
>
> Q.     And during all of those shifts were you able to perform all of your duties as a paramedic?
>
> A.     Besides paperwork.
>
> * * *
>
> Q.     Were there other modifications to your job [other than sleeping in the ambulance bay] that you needed because of your PTSD?

10

A.       No.

* * *

Q.       Were you able to do everything you needed to do at work during your shift?

A.       Besides getting caught up with my paperwork, yes.

*Id.* at 62:19–63:4, 65:6–14, 122:12–14, 137:4–6. Lustig does not contend that her struggles with paperwork are related to her PTSD.

In response, Lustig submits a Declaration stating that she requested a Stress Debriefing "because [she] needed support to manage the effects of work-related trauma," and that she "viewed [the Stress Debriefing] as an accommodation that would help [her] continue performing [her] duties as a paramedic." (Filing No. 65-1 ¶ 5). The County replies that Lustig cannot use her Declaration to create a genuine dispute of material fact. The County is correct. During her deposition, Lustig repeatedly and unambiguously stated that she was able to perform all the duties of her paramedic position, even without a Stress Debriefing. Lustig's new declaration contradicts these prior statements, and she offers no reason for the contradiction. Her declaration therefore does not create a genuine dispute as to whether she was able to perform her essential job functions without accommodation. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015); *United States ex rel. Robinson v. Ind. Univ. Health Inc.*, 204 F. Supp. 3d 1040, 1044 (S.D. Ind. 2016).

Lustig argues that her need to take FMLA leave in 2022 shows that she "was unable to perform the essential functions of her employment without the accommodation she requested." (Filing No. 66 at 15). In her FMLA paperwork, Lustig's doctor lists occupational stress and mental trauma as the reason for her 2022 FMLA leave (Filing No. 59-4 at pp. 154–58). However, to the extent Lustig offers her doctor's statements to prove the truth of the matter asserted—that Lustig was unable to perform her job duties because of work-related stress—they are inadmissible hearsay. The undisputed material facts show that Lustig was able to perform all her job duties

without a Stress Debriefing. Accordingly, no reasonable jury could conclude that the County had a duty to provide any further accommodation.

Lustig alternatively argues that even if she did not need the Stress Debriefing to perform her job duties, the County was still required to reasonably accommodate her, citing *Equal Employment Opportunity Commission v. Charter Communications, LLC*, 75 F.4th 729, 738–39 (7th Cir. 2023) (Filing No. 66 at 14). This case is inapposite. In *Charter Communications*, the plaintiff had a visual impairment, and his doctor recommended that he avoid driving at night. *Id.* at 732. The plaintiff requested a modified work schedule to limit his nighttime driving, but the employer declined the request. *Id.* at 732–33. The district court granted summary judgment in the employer's favor because the plaintiff "did not need any accommodation to perform an essential job function *once he arrived at work*." *Id.* at 733 (emphasis added). The Seventh Circuit reversed. The appellate court "decline[d] to draw a bright line between accommodations at the employer's workplace and accommodations that address transportation problems," and held that that "if an employee's disability substantially interferes with his ability to travel to and from work, the employee may be entitled to a reasonable accommodation if commuting to work is a prerequisite to an essential job function . . . and if the accommodation is reasonable under all the circumstances." *Id.* at 734, 738.

*Charter Communications* did not hold that an employer is required to accommodate an employee's disability whenever that accommodation does not pose an undue hardship (Filing No. 66 at 14). To the contrary, the Seventh Circuit reaffirmed that "if the employee can do his or her job without any accommodation, the ADA does not require the employer to provide any." *Id.* at 739 (citing *Brumfield*, 735 F.3d at 630); *see Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1053–54 (7th Cir. 2024) ("A reasonable accommodation is a measure that enables the employee to 'perform

the essential functions of the employment position.'" (quoting 42 U.S.C. § 12111(8))); *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017) (stating that a reasonable accommodation "is expressly limited to those measures that will enable the employee to work."); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995) ("The duty of reasonable accommodation is satisfied when the employer does what is necessary to enable the disabled worker to work in reasonable comfort.").

By her own admission, Lustig did not require a Stress Debriefing or other accommodation to perform her essential job duties. The County therefore owed her no duty of accommodation. *See Johnson v. Allure Lifestyle Cmtys.*, No. 23 CV 17062, 2025 WL 3210395, at *7–8 (N.D. Ill. Nov. 18, 2025) (finding that plaintiff's admission that he needed no accommodation to perform essential job functions meant that employer had no duty to accommodate plaintiff's disabilities; granting summary judgment in favor of employer on ADA failure to accommodate claim).

### b.  <u>Whether Lustig Could Have Performed Her Duties With an Accommodation</u>

The County alternatively argues that the reason for Lustig's increasing frustrations at work was a lack of resources and accountability (Filing No. 59 at 17; Filing No. 69 at 4; Filing No. 59-4 at 59:11–61:12). So Lustig's participation in a Stress Debriefing would not have affected her ability to perform her job duties. "In response to an employer's motion for summary judgment, it is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that she *would have* been able to perform the essential functions of her job *with* a reasonable accommodation." *Basden v. Pro. Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) (emphases added).

Even assuming that Lustig was unable to perform her paramedic duties without an accommodation, she offers no evidence as to how a Stress Debriefing would have enabled her to perform those duties. During her deposition, she only stated that she was "hoping" a Stress Debriefing would reduce her nightmares and give her "some sort of inner peace." (Filing No. 59-

4 at 129:24–130:2). *See Basden*, 714 F.3d at 1038 (finding that plaintiff had not adequately shown that leave would have accommodated her disability despite evidence that "medication improved her condition; that she had hoped for enough improvement to return to work regularly after leave; and that she subsequently had brief employment that was interrupted by a two-week absence caused by her condition"); *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 547 (7th Cir. 2008) (affirming summary judgment in favor of employer where plaintiff was already being provided the only accommodation proven to effectively remedy plaintiff's disability, and where plaintiff offered no evidence showing that her additional requested accommodation would have effectively accommodated her); *Weigel v. Target Stores*, 122 F.3d 461, 468–69 (7th Cir. 1997) (affirming summary judgment in favor of employer because treating physician's statement that "there was a good chance" that plaintiff could have returned after requested leave was not sufficient to create a triable issue as to whether plaintiff was a "qualified individual with a disability"). Lustig's testimony that "talk therapy is not [her] thing" casts further doubt on her claim that a Stress Debriefing (which Lustig describes as a type of talk therapy) would have been effective for her (Filing No. 59-4 at 56:12–23, 118:13–14).

Lustig's evidence is "too conclusory and uninformative to support a conclusion that an accommodation would have been successful." *Basden*, 714 F.3d at 1038; *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 418 (7th Cir. 2016) ("The problem . . . is not that [plaintiff] failed to produce a certain type of evidence; it is that the evidence she presented is insufficient to meet her burden."); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289 (7th Cir. 2015) (stating plaintiffs cannot "rel[y] upon a conclusory and untested opinion/hope that the proposed treatment/accommodation would enable them to perform the essential functions of their jobs").

The County is therefore entitled to summary judgment "despite any shortcomings" in its response to Lustig's requests for a Stress Debriefing. *Basden*, 714 F.3d at 1039 ("Even if an employer fails to engage in the required process, that failure need not be considered if the employee fails to present evidence sufficient to reach the jury on the question of whether she was able to perform the essential functions of her job with an accommodation.").

There is no triable issue as to whether Lustig was entitled to an accommodation. Based on the undisputed material facts, Lustig could perform her essential job duties without an accommodation. But even if a reasonable jury could find that Lustig could not perform her job duties without an accommodation, Lustig fails to show that she could have performed her duties with one. In either case, the County was not obligated to provide an accommodation. The County's Motion for Summary Judgment is **granted** as to the failure to accommodate claim.

### 2. Disability Discrimination and Retaliation

Lustig contends that the County suspended and terminated her because of her disability and in retaliation for her requesting a Stress Debriefing and complaining about Scott's derogatory comment about Lustig's mental health (Filing No. 66 at 18). For Lustig's disability discrimination claim to survive summary judgment, the evidence must permit a reasonable jury to find that her disability caused the adverse employment actions at issue. *Upchurch v. Indiana*, 146 F.4th 579, 586–87 (7th Cir. 2025). Similarly, for her retaliation claim, the evidence must permit a reasonable jury to draw a causal link between Lustig's requests for an accommodation and/or complaints of Scott's derogatory comments and the adverse employment actions. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) ("The key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action."). Although Lustig's discrimination and retaliation claims are distinct, they are based on

the same evidence, so the Court discusses them together. *Upchurch*, 146 F.4th at 579 (discussing discrimination and retaliation claims together).

Lustig contends that based on the evidence in the summary judgment record, a reasonable jury could find that the proffered, nondiscriminatory reasons for her suspension and termination— disruptive behavior and a potential HIPAA violation—"were pretextual and that the true reason for Lustig's suspension and termination was a disability and Lustig's protected activity." (Filing No. 66 at 24). As the Seventh Circuit has explained, "pretext means more than a mistake . . . pretext means a lie, specifically a phony reason for some action." *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) (citation modified).

Lustig asserts that several types of evidence show pretext: Swift's personal animus; deficiencies with Corbin's investigation into her phone call with Rose; inconsistencies in Swift's summary judgment affidavit; suspicious timing; and departures from the County's standard discipline policies. *Id.* at 18, 23–24.

### a.  Swift's Personal Animus

Lustig claims that Swift demonstrated unlawful animus by: laughing at Scott's derogatory comment; making her own derogatory comments to Lustig; approving Lustig's sleep accommodation "with a lot of attitude"; failing to mark Lustig's leave time as FMLA-qualifying; and refusing to let Lustig go on EMS runs when she returned from FMLA leave (Filing No. 66 at 18, 22–23). However, Dr. Coots decided to suspend Lustig, and the Commissioners decided to terminate her.[4] Evidence of Swift's personal animus is not probative of Dr. Coots' or the Commissioners' intent.

---

[4] Lustig does not assert that Swift provided information that may have affected Dr. Coots' or the Commissioners' decisions. *Smith v. Bray*, 681 F.3d 888, 897 n.3 (7th Cir. 2012) (describing the "cat's paw" theory of liability).

Further, most of Swift's remarks and conduct were not close in time to Lustig's suspension or termination, and none related to Lustig's termination, giving this evidence even less probative value. *See Phelps v. Ivy Tech Cmty. Coll. of Ind.*, No. 22-cv-40, 2024 WL 1056149, at *10 (S.D. Ind. Feb. 7, 2024) (granting summary judgment to defendant in race discrimination case; "[plaintiff's] circumstantial evidence offers little probative value of discriminatory motive. Many of the comments and incidents with colleagues occurred years before [his] termination, involved non-decisionmakers, and had no relation to his employment status."); *see also Rush v. McDonald's Corp.*, 966 F2.2d 1104, 1116 (7th Cir. 1992) ("[Plaintiff] has not shown that the animus reflected in the defendants' alleged conduct on other occasions was the cause of the decision to discharge her, rather than a serious violation of [the] attendance policy.") *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686–87 (7th Cir. 1991) ("Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge.").

### b.  Deficiencies in County's Internal Investigation

Lustig also supports her claim of pretext with deficiencies in the County's internal investigation. Lustig notes that the investigator, Corbin, had no investigatory experience; did not ask anyone if they "heard the name of a patient or any other personally identifiable information"; declined Lustig's offer to submit her phone to a forensic examination; and was friends with Swift (Filing No. 66 at 20). This evidence is not sufficient to show pretext.

"Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer." *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). To show pretext based on Corbin's investigation, Lustig "must offer evidence tending to show that the [County] did not actually believe the findings of the investigation." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F. 3d 857, 964 (7th Cir. 2015). The evidence "'must identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the report 'that a reasonable person could find [it] unworthy

17

of credence.'" *Id.* (quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012) (alteration in original)). "In a typical sham investigation, persons conducting the investigation fabricate, ignore, or misrepresent evidence, or the investigation is circumscribed so that it leads to the desired outcome (for instance, by deliberately failing to interview certain witnesses)." *Harden*, 799 F.3d at 964. While Corbin's investigation could have been more thorough, focused on different issues, or been led by someone more experienced, the investigation was not so deficient that it suggests pretext.

Lustig argues that Corbin should have, but did not, obtain statements regarding whether anyone heard personally identifiable information shared between Rose and Lustig, and a forensic examination of Lustig's phone. Lustig believes that this information would have proven that she did not violate HIPAA. However, Corbin never drew any conclusions about whether Lustig violated HIPAA, and his recommendations to the Commissioners were not based on any such conclusions. The fact that Corbin did not focus more on proving, or disproving, that a HIPAA violation in fact occurred does not show that his investigation was a sham or pretextual.

Lustig also notes that Corbin previously worked with Swift elsewhere, but she fails to explain how or whether Corbin's relationship with Swift affected his investigation. Importantly, Swift had left the County by the time Corbin interviewed Lustig and submitted his recommendation to the Commissioners. Lustig also alleges in her response brief that Sylvia Byers, who sat in on Lustig's interview with Corbin, "was a church friend of Swift's." (Filing No. 66 at 20). But Lustig cites no evidence supporting this assertion.

There is no evidence that Corbin's report is factually baseless, or that the proffered reasons for Lustig's termination are insufficient to warrant suspension or termination. *See Gusewelle v. City of Wood River*, 374 F.3d 569, 575 (7th Cir. 2004) (explaining how a plaintiff can show that a

18

proffered reason is "unworthy of belief" and thus pretextual). The undisputed material facts show that Lustig was disruptive at work, at least to the extent she repeatedly criticized her supervisor Swift. More generally, Lustig offers no evidence disputing her co-workers claims to Corbin that they considered her behavior at work to be "toxic." Lustig also cites no evidence showing that Corbin inaccurately documented her version of events, Rose's version of events (as Rose relayed them to Corbin), or the differences between the two.

Although Lustig vehemently disagrees with Corbin's conclusions that she was dishonest and might have violated HIPAA, she has not shown that Corbin's report was so deficient that it suggests pretext. "[E]ven where a plaintiff . . . alleges that 'the company's investigation was imprudent, ill-informed and inaccurate,' summary judgment is appropriate unless the employee 'could point to facts suggesting that the company investigated [her] differently'" because of her protected status. *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999); *see Stockwell v. City of Harvey*, 597 F.3d 895, 901–02 (7th Cir. 2010) ("[C]ourts are not 'superpersonnel department[s]' charged with determining best business practices." (second alteration in original)).

### c.  <u>Inconsistencies in Swift's Affidavit</u>

Next, Lustig points out perceived inconsistencies in Swift's affidavit, which either relate to immaterial details or are based on gross speculation (Filing No. 66 at 20–21 (implying that the signature on Swift's affidavit was forged)). The Court will not spend time discussing these alleged inconsistencies because they are immaterial to the pending summary judgment motion. The proper way for Lustig to dispute facts in Swift's affidavit was to designate contrary evidence, and at this stage, the Court does not weigh testimony, so Lustig's attacks on Swift's credibility are misplaced.

### d.  <u>Suspicious Timing</u>

Lustig claims that the timing of her suspension and termination are suspicious because she "had not received any discipline prior to her complaining to Swank about Swift's discriminatory

19

conduct." (Filing No. 66 at 18). However, "the fact that an adverse action occurred sometime after protected activity does not establish causation." *Jackson v. Delaware Cnty. Sheriff's Dep't*, No. 17-cv-3248, 2020 WL 564311, at *4 (S.D. Ind. Feb. 5, 2020) (citation modified).

Lustig first requested a Stress Debriefing in May 2021, and in October 2022, she repeated her request and complained about Scott's derogatory comment. Lustig was suspended five months later, and terminated two more months after that. These months-long gaps do not suggest discriminatory or retaliatory intent. *See Bless v. Cook Cnty. Sheriff's Office*, 9 F.4th 565, 573 (7th Cir. 2021) (explaining that an adverse employment action must "follow[] close on the heels of protected expression," and timing must be "very close—as in no more than a few days" to show impermissible intent (citation modified)); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 587 (7th Cir. 2021) ("A delay of two or three months between any protected activity and adverse action is far from sufficient to raise an inference of retaliation."); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000) (stating that timing of the adverse action is suspicious when it occurs "fairly soon after the employee's protected expression").

To the contrary, the timing of Lustig's suspension and termination supports the County's proffered reasons. Lustig received no discipline or other adverse employment action for nearly two years after first requesting a Stress Debriefing in May 2021, and for approximately five months after complaining to Swank about Scott and Swift's demeaning comments. By contrast, Lustig was suspended approximately five days after her phone call with Rose; and terminated approximately one month after Corbin submitted his investigation to the Commissioners. When comparing these gaps, no reasonable jury could conclude that Lustig's suspension or termination was discriminatory or retaliatory. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) ("Suspicious timing alone is rarely enough to survive summary judgment particularly when there are reasonable,

non-suspicious explanations for the timing of the [adverse employment actions]." (citation modified)); *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937 (7th Cir. 2022) (finding that two-day period between request for accommodation and termination did not save claims from summary judgment in light of intervening report of PTO policy violations by plaintiff, which supported proffered reason for termination).

### e.  <u>Departure from Disciplinary Policies in December 2022</u>

Lustig further contends that the written discipline she received in December 2022 is suspicious because it did not conform to the County's progressive discipline policy or problem resolution policy. (Filing No. 66 at 22); *see Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 352–53 (7th Cir. 2009) ("An employer's departure from its own employment policies can constitute circumstantial evidence of discrimination."). Lustig does not cite any evidence that she received this written warning. However, even if the designated evidence did show that Lustig received this written discipline, it would not suggest a discriminatory or retaliatory intent for two reasons.

First, there is no evidence that any written warning was a departure from the County's disciplinary procedures. In her response brief, Lustig generally cites the County's disciplinary handbook without identifying the part from which the County allegedly departed (Filing No. 66 at 22). A closer review of the policy reveals that the County is not bound by strict disciplinary procedures. The policy provides examples of "offenses" and corresponding "discipline," but iterates that these lists are "merely illustrative" and are not intended to limit "the County's discretion in exercising discipline as it finds appropriate." (Filing No. 65-12 at 1, 4). "[W]hen a progressive discipline policy permits the employer to exercise discretion in discharging an employee without exhausting all of the policy's steps, failure to follow all of the steps does not suggest a discriminatory motive." *Long.*, 585 F.3d at 352–53. The County's disciplinary policy is discretionary, so its decision to issue a written warning does not suggest an unlawful motive.

Second, no evidence connects any alleged deviation from the County's procedure to Lustig's disability or protected activity. *See Roney v. Ill. Dep't of Transp.*, 376 F. Supp. 2d 857, 870–71 (N.D. Ill. July 11, 2005) (finding that employee failed to connect departure from policies to retaliation; granting employer's motion for summary judgment). The Seventh Circuit "do[es] not require that an employer rigidly adhere to procedural guidelines in order to avoid an inference of retaliation. Instead, [courts] look for pretext in the form of 'a dishonest explanation, a lie rather than an oddity or an error.'" *Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012) (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). "Moreover, when independent surrounding circumstances indicate that the employee's performance was seriously deficient and worthy of disciplinary action, a procedural abnormality will not suffice to establish a retaliatory motive." *Id.* Lustig cites no evidence suggesting that the December 2022 written warning was anything other than an abnormality, or any evidence that her refusal to promptly deliver the employee statements to Commissioner Monjar was unworthy of a written warning. *Kidwell*, 679 F.3d at 969.

**f.  Consideration of All Evidence**

Based on the totality of the evidence, no reasonable jury could find that Lustig's suspension or termination was caused by her disability or protected action. Lustig offers scant evidence of discrimination and retaliation, including; statements by Swift, a non-decisionmaker; immaterial deficiencies in the County's internal investigation; misplaced attacks on Swift's credibility; tenuous evidence of suspicious timing; and the County's discretionary disciplinary policies. Lustig's very limited evidence does not create a genuine dispute of material fact as to unlawful intent where a wealth of evidence demonstrates a clear causal connection between the County's proffered reasons and Lustig's suspension and termination, as well as evidence that Rose—who is not alleged to be

disabled or have engaged in protected activity—was also terminated. The County's Motion for Summary Judgment is **granted** as to the ADA discrimination and retaliation claims.

**B.    FMLA Claims**

Lustig claims that the County interfered with her FMLA leave, unlawfully prohibited her from participating in EMS runs upon her return from FMLA leave in 2023, and retaliated against her by terminating her employment.

**1.    Interference with FMLA Leave**

Lustig's Amended Complaint alleges that the County interfered with her FMLA rights "by forcing her to work unpaid during her approved FMLA leave." (Filing No. 22 ¶ 107). However, as the County notes in its brief, Lustig admits that "Defendant did not force [her] to work while on FMLA leave." (Filing No. 59-6 at 3). In response, Lustig does not dispute her prior admission that the County did not force her to work while on FMLA leave. But she does not concede a lack of interference, either. Instead, Lustig contends that the County interfered with her FMLA leave when Swift marked Lustig's FMLA leave as only "sick time," and not also as FMLA-qualifying leave (Filing No. 66 at 4). As a matter of law, the County's failure to designate Lustig's leave time as FMLA-qualifying does not constitute interference.

In *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002), the United States Supreme Court invalidated an FMLA regulation requiring employers to provide additional leave time if the employer failed to designate leave time as FMLA-qualifying. The Supreme Court explained that this regulation "alter[ed] the FMLA's cause of action in a fundamental way" because it "relieve[d] employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 90. Lustig concedes that her ability to take FMLA leave was not actually impaired, and she identifies no prejudice resulting from the County's improper leave time designation (Filing No.

59-4 at 47:15–48:1). *See Ridings v. Riverside Medical Ctr.*, 537 F.3d 755, 762 (2008) (finding no FMLA interference where employer failed to designate time off as FMLA-qualifying).

Based on the undisputed material facts, the County did not interfere with Lustig's FMLA rights. The County's Motion for Summary Judgment is **granted** as to the interference claims.

### 2.   FMLA Violations Based on Return to Work in 2023

Lustig next alleges that the County violated the FMLA by not allowing her to "return to the same terms and conditions of her employment" when she returned from her 2022 FMLA leave. (Filing No. 22 at 14). Specifically, when Lustig returned to a part-time position in 2023, Swift refused to allow her to participate in EMS runs until she completed her unfinished run reports (Filing No. 66 at 24–25).

Under the FMLA, an employee on leave is entitled to be restored to the same or equivalent position that she had before taking qualifying leave. 29 U.S.C. § 2614(a)(1)–(2). The FMLA also makes it unlawful to "discharge" or "in any manner discriminate" against a person for opposing any practice the FMLA makes unlawful. 29 U.S.C. § 2615(b). The failure to restore an employee to an equivalent position upon return from FMLA could therefore constitute interference and/or a retaliation under the FMLA. *See Goelzer v. Sheboygan Cnty.*, 604 F.3d 987, 992 (7th Cir. 2010). It is unclear whether Lustig is asserting both interference and retaliation claims based on the County's failure to return her to an equivalent position, but the Court assumes that she is.

The difference between retaliation and interference under the FMLA is that retaliation "requires proof of discriminatory or retaliatory intent while [interference] requires only proof that the employer denied the employee his or her entitlements under the Act." *Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884 (7th Cir. 2005). To succeed on a retaliation claim, a plaintiff must show that "the protected conduct was a substantial or motivating factor in the employer's decision." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 741–42 (7th Cir. 2008) (citation modified).

The County argues that it did not interfere with Lustig's FMLA rights because Lustig voluntarily resigned from her full-time position and requested a part-time position upon her return from FMLA leave. The County also argues that it did not retaliate against Lustig and had a legitimate, non-invidious reason for requiring her to complete her run reports before participating in EMS runs (Filing No. 59 at 22–23).

The Court agrees with the County that Lustig voluntarily forewent her right to be returned to her same position when she resigned her full-time paramedic position. The FMLA "does not prohibit an employer from accommodating an employee's request to be restored to a different shift, schedule, or position which better suits the employee's personal needs on return from leave." *Id.* § (e)(4). However, under the FMLA "[a]n equivalent position must have substantially similar duties, conditions, responsibilities, privileges and status as the employee's original position." *Id.* § 29 C.F.R. § 825.215(e).

Based on the designated evidence, taken in the light most favorable to Lustig, a reasonable jury could find that the County denied her an essential responsibility, duty, and privilege of her former position—EMS runs. *See Menge v. Simon's Trucking, Inc.*, No. C20-1016, 2021 WL 3921346, at *5 (N.D. Iowa Sept. 1, 2021) (citing Eighth Circuit cases in which changes to job duties upon return from FMLA leave constituted interference; denying employer's motion for summary judgment on interference claim based on failure to return plaintiff to equivalent position).

The Court likewise finds that a reasonable jury could find that Lustig's relegation to run reports was motivated by discrimination or retaliation. The County does identify important and lawful reasons for requiring Lustig to complete her outstanding run reports; unfinished reports leave patient files incomplete and prevent the County from billing for its EMS services provided (Filing No. 59 at 20–21). However, Lustig offers undisputed evidence that many County

paramedics regularly failed to timely complete their paperwork. The fact that only Lustig was precluded from going on EMS runs might show that the County's proffered reasons are pretextual (Filing No. 59-4 at 97:8–15). This evidence of pretext, combined with the suspicious timing of this work restriction (immediately upon Lustig's return from FMLA leave for mental health reasons), evidence that Swift lifted the restriction a month later for one shift and then never re-imposed the restriction, *id.* at 97:8–15, and undisputed evidence of comments Swift made to Lustig about her "emotional competen[ce]," *id.* at 98, are sufficient to create a genuine dispute as to the County's motivation. The County's Motion for Summary Judgment is therefore **denied** as to Lustig's FMLA interference and retaliation claims based on her preclusion from EMS runs upon her return from FMLA leave in 2023.

### 3. **FMLA Retaliation Based on Termination**

The Amended Complaint alleges that the County retaliated against Lustig in violation of the FMLA by terminating her (Filing No. 22 ¶ 104). However, Lustig fails to discuss this claim in her summary judgment response. To the extent this claim is not deemed abandoned, it must fail for the same reasons as Lustig's ADA retaliation claim. Courts evaluate claims of FMLA retaliation in the same way they evaluate claims of retaliation under other employment statutes. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). As the Court discusses above, there is ample evidence supporting the County's proffered, lawful reason for Lustig's termination. The five-month gap between Lustig's December 2022 FMLA leave and termination in May 2023 cuts strongly against a finding of suspicious timing, and there is no evidence connecting Lustig's 2022 FMLA leave (or Swift's actions and comments in 2023) to the Commissioners' decision to terminate Lustig. The County is therefore entitled to summary judgment on any FMLA retaliation claim based on Lustig's termination.

### C.    <u>Fourteenth Amendment Due Process Claims</u>

Lustig lastly asserts claims for violations of her due process rights under the Fourteenth Amendment of the United States Constitution. Lustig alleges that the County violated her procedural due process rights by terminating her without prior notice, notices of certain rights, or a hearing; and violated her substantive due process rights "by taking actions without due process that resulted in the loss or eventual loss of her paramedic certification." (Filing No. 22 ¶¶ 109–19).

The Fourteenth Amendment establishes that "[n]o State shall . . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. Procedural due process claims involve "a two-step inquiry: (1) whether the defendants deprived the plaintiff[] of a constitutionally protected liberty or property interest; and (2) if so, whether that deprivation occurred without due process of law." *Doe v. Heck*, 327 F.3d 492, 526 (7th Cir. 2003), *as amended on denial of reh'g* (May 15, 2003) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)). To assert a substantive due process claim, a plaintiff "must allege that the government violated a fundamental right or liberty," and that the violation was "arbitrary and irrational." *Campos v. Cook Cnty.*, 932 F.3d 972, 975 (7th Cir. 2019).

The County argues that Lustig cannot show a procedural or substantive due process violation because she has no protectible property right in her employment (Filing No. 59 at 24–25). In response, Lustig does not dispute that she lacks a property interest in her employment. Instead, she argues that because of her arbitrary termination, her paramedic "license was taken from her without due process." (Filing No. 66 at 25–26).

Before replying to the merits of Lustig's response, the County argues that any due process claims based on Lustig's paramedic certification—rather than her employment—are being raised for the first time on summary judgment. The Court does not agree. The Amended Complaint plainly alleges, "Defendants deprived Plaintiff of her Emergency Medical Certification resulting

in substantial [*sic*] and procedural due process deprivation of her rights," and "[a]t all times relevant, Plaintiff was a 'certified employee' who, as a condition of employment, holds a valid certification under IC § 16-31-3 by the Indiana emergency medical services commission established by IC § 16-31-2-1." (Filing No. 22 ¶¶ 62–63). The Amended Complaint further alleges "Defendant deprived Plaintiff of liberty by taking actions without due process that resulted in the loss or eventual loss of her paramedic certification." *Id.* ¶ 117. Lustig raised procedural and substantive due process claims related to her paramedic certification in her Amended Complaint, so her summary judgment response appropriately argues that those claims are viable.

The County also argues that Lustig's due process claims fail on the merits because there is no evidence that Lustig has no protectible interest in a paramedic "certification" rather than a license; and because there is no evidence that Lustig's certification was revoked or will be revoked (Filing No. 69 at 11–12). The Court must begin with the County's second argument because, in substance, it challenges ripeness and standing and therefore implicates the Court's subject-matter jurisdiction. *See Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008); *Johnson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 719 F.3d 601, 602 (7th Cir. 2013).

Article III of the Constitution limits federal courts to resolving "cases" and "controversies." U.S. Const. art. III, § 2. This limitation "requires a claim that is ripe and a plaintiff who has standing." *Ind. Right to Life, Inc. v. Shepard*, 507 F.3d 545, 549 (7th Cir. 2007). To have standing, a plaintiff must have suffered (1) an injury in fact, (2) that is fairly traceable to the defendant and (3) likely to be redressed by a favorable judicial decision. *Bost v. Ill. State Bd. of Elections*, 114 F.4th 634, 639 (7th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). A claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation modified).

Lustig's brief states that her certification "was taken from her" (Filing No. 66 at 26), but there is no evidence that her certification has been revoked, expired, or become inactive. Instead, as explained in Lustig's Declaration, she is merely concerned that her certification "*will* expire and *become* inactive" (Filing No. 65-1 at 4 (emphases added)). Lustig contends that she "is required to be affiliated with a certified paramedic provider organization or supervising hospital to maintain her license as a paramedic," citing 836 Ind. Admin. Code 4-9-3, and without an affiliation with Switzerland County, her license will expire (Filing No. 66 at 26). The County correctly notes that Section 4-9-3 relates to *applicants* for paramedic certifications, and not current certification holders (Filing No. 69 at 12). Nevertheless, to the extent Lustig does need an affiliation to maintain an active certification, she could become employed by or volunteer for another medical services provider or hospital. *Id.* As a result, Lustig cannot show an "actual or imminent" deprivation of her interest in her certification.

The possibility that Lustig *might* not become affiliated with another qualifying organization, or that her certification *might* be revoked or declined for renewal at some later date, is not enough to establish an injury in fact or ripeness. "A plaintiff who has not suffered a past harm cannot simply rest on allegations that [s]he may suffer some 'possible future injury,' 'at some indefinite future time.' [Her] threatened injury instead must be 'certainly impending' to satisfy Article III." *Dinerstein v. Google, LLC*, 73 F.4th 502, 512 (7th Cir. 2023) (citation modified) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *Lujan*, 504 U.S. at 564 n.2); *see Williams v. Vill. of Alsip*, No. 22 C 4892, 2024 WL 1116106, at*6 (N.D. Ill. Mar. 14, 2024) (finding that plaintiffs lacked standing to bring due process claim because challenged ordinance only "created a 'risk' or 'possibility'" that landlord might attempt to remove plaintiffs from their apartment, which was "insufficient to give rise to an injury in fact"). Lustig's injury arising from

the revocation/non-renewal of her certification is not imminent and rests upon contingent future events that may not occur. Her due process claims must therefore be dismissed without prejudice for lack of standing and lack of ripeness.[5]

### IV.    CONCLUSION

For the reasons discussed in this Order, the County's Motion for Summary Judgment (Filing No. 58) is **GRANTED in part** and **DENIED in part**. Summary judgment is **granted** as to Counts I, II, and III—Lustig's ADA claims. Lustig voluntarily abandoned her FLSA Claims—Counts IV and V, so those claims are **dismissed with prejudice**. Lustig's Fourteenth Amendment claims—Counts VIII, IX and X are **dismissed without prejudice**.

A genuine dispute of material facts exists, and summary judgment is **denied** as to Count VI and Count VII—Lustig's FMLA interference and retaliation claims based on her preclusion from EMS runs upon her return from her 2022 FMLA leave. Those claims shall **PROCEED** to trial or settlement.

This matter remains set for a final pretrial conference on July 1, 2026, and a jury trial beginning July 27, 2026. The parties are **directed** to contact the Magistrate Judge to schedule a settlement conference.

**SO ORDERED**.

Date:    2/13/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

---

[5] A dismissal for lack of subject-matter jurisdiction is not a decision on the merits and thus is without prejudice. *See Kowalski v. Boliker*, 893 F.3d 987, 994 (7th Cir. 2018).

Distribution:

Julie C. Alexander
JOHN H. HASKIN & ASSOCIATES, LLC
jalexander@jhaskinlaw.com

Rachel Dever
CHURCH CHURCH HITTLE AND ANTRIM
rdever@cchalaw.com

John H. Haskin
JOHN H. HASKIN & ASSOCIATES, LLC
jhaskin@jhaskinlaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
lroberts@cchalaw.com